**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

EDWARD GALMON, SR., CIARA HART,
NORRIS HENDERSON, and TRAMELLE
HOWARD,

                Plaintiffs,

    v.

R. KYLE ARDOIN, in his official capacity as
Louisiana Secretary of State,

                Defendant.

Case No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Edward Galmon, Sr., Ciara Hart, Norris Henderson, and Tramelle Howard file
this Complaint for Declaratory and Injunctive Relief against Defendant R. Kyle Ardoin, in his
official capacity as Louisiana Secretary of State, and allege as follows:

1.     Plaintiffs bring this action to challenge Louisiana's new congressional districting
plan, House Bill 1 ("HB 1"), on the ground that it violates Section 2 of the Voting Rights Act of
1965, 52 U.S.C. § 10301.

2.     Louisiana has the second-highest proportion of Black residents in the United States,
comprising nearly one-third of the state's population. But Black Louisianians have the opportunity
to elect their candidates of choice in only *one* of Louisiana's six congressional districts.
Meanwhile, white Louisianians, who make up just 57.1 percent of the state's population, can elect
their candidates of choice in the remaining five—*83 percent* of the state's congressional districts.

3.     HB 1 perpetuates this imbalance by packing Black voters into the Second
Congressional District while cracking Louisiana's other Black communities into districts that

extend into the southern, western, and northern reaches of the state. In so doing, HB 1 dilutes the electoral strength of the state's Black community.

4.      The Louisiana State Legislature was well aware of the need to draw a second majority-Black congressional district when it passed HB 1. Governor John Bel Edwards vetoed the map when it arrived on his desk, explaining that it "is simply not fair to the people of Louisiana and does not meet the standards set forth in the federal Voting Rights Act." The Legislature ignored the Governor's admonition, overrode his veto, and enacted HB 1 into law.

5.      The 2020 census data confirm that Black Louisianians are sufficiently numerous and geographically compact to form a majority of eligible voters—which is to say, a majority of the voting-age population[1]—in a second congressional district. This new majority-Black district would unite communities of shared interests while respecting neutral districting principles.

6.      An array of factors—including Louisiana's sordid history of racial discrimination in voting, the continued use of racial appeals in the state's elections, and persistent socioeconomic disparities between Black and white Louisianians that hinder the ability of Black voters to participate effectively in the political process—further demonstrates that the Legislature's failure

---

[1] The phrases "majority of eligible voters" and "majority of the voting-age population" have been used by courts interchangeably when discussing the threshold requirements of a vote-dilution claim under Section 2 of the Voting Rights Act. *Compare, e.g.*, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) ("[T]he first *Gingles* precondition . . . requires only a simple *majority of eligible voters* in a single-member district." (emphasis added) (quoting *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991))), *and Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 428 (M.D. La. 2017) (similar), *overruled on other grounds sub nom. Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020), *with Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality op.) ("[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up *more than 50 percent of the voting-age population* in the relevant geographic area?" (emphasis added)). The phrase "majority of eligible voters" when used in this Complaint shall also refer to the "majority of the voting-age population."

to create a second congressional district in which Black voters have an opportunity to elect their preferred candidates dilutes Black voting strength in violation of Section 2.

7.      Accordingly, Plaintiffs seek an order (i) declaring that HB 1 violates Section 2 of the Voting Rights Act; (ii) enjoining Defendant from conducting future elections under HB 1; (iii) ordering adoption of a valid congressional districting plan that gives Black voters the opportunity to elect their candidates of choice in two districts; and (iv) providing any and such additional relief as is appropriate.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C.§§ 1331, 1343(a)(3) and (4), and 1357 because the matter in controversy arises under the laws of the United States and involves the assertion of deprivation, under color of state law, of rights under federal law.

9.      Venue is proper under 28 U.S.C. § 1391(b) because "a substantial part of the events or omissions giving rise to the claim occurred" in this district.

10.     This Court has authority to grant declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

11.     Plaintiff Edward Galmon, Sr. is a Black citizen of the United States and the State of Louisiana. Mr. Galmon is a registered voter and intends to vote in future congressional elections. He is a resident of St. Helena Parish and located in the Fifth Congressional District under Louisiana's new congressional plan, where he is unable to elect candidates of his choice to the U.S. House of Representatives despite strong electoral support for those candidates from other Black voters in his community. Mr. Galmon resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly

drawn congressional district in which Black voters would have the opportunity to elect their preferred candidates. The new congressional districting plan dilutes the voting power of Black voters like Mr. Galmon and denies them an equal opportunity to elect candidates of their choice to the U.S. House of Representatives.

12.    Plaintiff Ciara Hart is a Black citizen of the United States and the State of Louisiana. Ms. Hart is a registered voter and intends to vote in future congressional elections. She is a resident of East Baton Rouge Parish and located in the Sixth Congressional District under Louisiana's new congressional plan, where she is unable to elect candidates of her choice to the U.S. House of Representatives despite strong electoral support for those candidates from other Black voters in her community. Ms. Hart resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn congressional district in which Black voters would have the opportunity to elect their preferred candidates. The new congressional districting plan dilutes the voting power of Black voters like Ms. Hart and denies them an equal opportunity to elect candidates of their choice to the U.S. House of Representatives.

13.    Plaintiff Norris Henderson is a Black citizen of the United States and the State of Louisiana. Mr. Henderson is a registered voter and intends to vote in future congressional elections. He is a resident of Orleans Parish and located in the Second Congressional District under Louisiana's new congressional plan. The Second Congressional District is a district in which Black voters like Mr. Henderson are packed, preventing the creation of an additional district in which Black voters have an opportunity to elect their preferred candidates, as required by the Voting Rights Act.

14.    Plaintiff Tramelle Howard is a Black citizen of the United States and the State of Louisiana. Mr. Howard is a registered voter and intends to vote in future congressional elections. He is a resident of East Baton Rouge Parish and located in the Second Congressional District under Louisiana's new congressional plan. The Second Congressional District is a district in which Black voters like Mr. Howard are packed, preventing the creation of an additional district in which Black voters have an opportunity to elect their preferred candidates, as required by the Voting Rights Act.

15.    Defendant R. Kyle Ardoin is the Louisiana Secretary of State. He is the "chief election officer of the state," La. R.S. 18:421(A), and as such will be "involved in providing, implementing, and/or enforcing whatever injunctive or prospective relief may be granted" to Plaintiffs. *Hall v. Louisiana*, 974 F. Supp. 2d 978, 993 (M.D. La. 2013).

## LEGAL BACKGROUND

16.    Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Thus, in addition to prohibiting practices that deny outright the exercise of the right to vote, Section 2 prohibits vote dilution.

17.    A violation of Section 2 is established if "it is shown that the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by members of a [minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

18.    Such a violation might be achieved by "cracking" or "packing" minority voters. To illustrate, the dilution of Black voting strength "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters"—cracking; "or from the

concentration of blacks into districts where they constitute an excessive majority"—packing. *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

19.    In *Gingles*, the U.S. Supreme Court identified three necessary preconditions for a claim of vote dilution under Section 2: (i) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (ii) the minority group must be "politically cohesive"; and (iii) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50–51.

20.    Once all three preconditions are established, Section 2 directs courts to consider whether, "based on the totality of circumstances," members of a racial minority "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

21.    The U.S. Senate report accompanying the 1982 amendments to the Voting Rights Act identified several nonexclusive factors that courts should consider when determining if, under the totality of circumstances in a jurisdiction, the operation of the electoral device being challenged results in a Section 2 violation. *See Gingles*, 478 U.S. at 44–45; *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991). These "Senate Factors" include:

a.    the history of official voting-related discrimination in the state or political subdivision;

b.    the extent to which voting in the elections of the state or political subdivision is racially polarized;

c.    the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the

minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting;

d.      the exclusion of members of the minority group from candidate slating processes;

e.      the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

f.      the use of overt or subtle racial appeals in political campaigns; and

g.      the extent to which members of the minority group have been elected to public office in the jurisdiction.

22.     "No one of the factors is dispositive; the plaintiffs need not prove a majority of them; [and] other factors may be relevant." *Westwego Citizens*, 946 F.2d at 1120; *see also NAACP v. Fordice*, 252 F.3d 361, 367 (5th Cir. 2001) (explaining that Section 2 requires "a flexible, fact-intensive inquiry predicated on 'an intensely local appraisal of the design and impact of the contested electoral mechanisms,'" "a searching practical evaluation of the 'past and present reality,'" and a "'functional' view of political life" (first quoting *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1147 (5th Cir. 1993); and then quoting *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 860 (5th Cir. 1993) (en banc))).

## FACTUAL ALLEGATIONS

## I.      Louisiana's 2011 Congressional Redistricting

23.     On April 13, 2011, the Legislature established Louisiana's six previous congressional districts. The Louisiana State Senate voted 25 to 13 to approve the 2011 congressional plan and the Louisiana House of Representatives voted in favor 63 to 56; the vast

majority of Black legislators voted against the plan. It was signed into law as Louisiana Revised Statute 18:1276.1 by then-Governor Bobby Jindal on April 14, 2011.

24.     Prior to the enactment of the 2011 congressional plan, multiple alternative maps were proposed, including maps containing a second Black-opportunity district.

25.     Senator Lydia Jackson proposed a congressional map that contained two horizontal districts for north Louisiana, one of which contained a Black voting-age population of approximately 36 percent. It was anticipated that this district would be one in which Black voters would have the ability to exert greater influence over congressional elections and demand greater responsiveness from their congressional representatives. While this plan initially passed through the Senate, it died in the House's redistricting committee after Governor Jindal publicly threatened to veto it. A similar minority-opportunity congressional district was proposed in the House by Representative Rick Gallot; this proposed plan gained even less traction, dying in committee and never reaching the House floor.

26.     Senate President Pro Tempore Sharon Weston Broome and Representative Michael Jackson introduced amendments to the 2011 congressional plan that would have created two majority-Black congressional districts. The additional majority-Black district would have included, among other parishes, East Feliciana, West Feliciana, and St. Helena, as well as the bulk of East Baton Rouge Parish's Black voters. Although all Black members of the Senate and most Black members of the House voted in favor of these amendments, they were ultimately defeated.

27.     The single majority-Black district in the 2011 congressional plan, the Second, contained parts of New Orleans and weaved around to Baton Rouge, capturing its western and northern neighborhoods. The shape of this Second Congressional District was significantly more contorted than it had been under the prior congressional districting plan.

## II.    The 2020 Census

28.    The 2020 decennial census reported that Louisiana's resident population, as of April 2020, was 4,657,757. This is an increase from a decade ago, when the 2010 census reported a population of 4,533,372.

29.    Louisiana's Black population increased by 3.8 percent overall between 2010 and 2020, with Black Louisianians now compromising roughly one-third of the state's population. By contrast, the state's white population *decreased* by 6.3 percent.

## III.    Louisiana's 2022 Congressional Redistricting

30.    Throughout the redistricting process that followed the 2020 census, Black Louisianians and civil rights groups again called for the enactment of a second majority-Black congressional district. At a public meeting of the Legislature's joint redistricting committee in Baton Rouge on November 16, 2021, residents pointed out that while Black Louisianians make up one-third of the state's population, only one of its six congressional districts is majority-Black. Representative Ted James, chair of the Legislative Black Caucus, emphasized this imbalance during his five-minute speech, repeating, "One-third of six is two."

31.    Although Louisianians were given various opportunities to provide public comment on the redistricting process, representatives of the Public Affairs Research Council of Louisiana concluded, in a guest column published in *The Advocate*, that the Legislature "disregarded many of the public comments and much of the hours of testimony they received and fell into age-old patterns of protecting incumbent officials, political parties and personal allies." They noted in particular that "[l]awmakers rejected overwhelming calls from people who attended hearings around the state and at the Louisiana Capitol to expand the number of majority-minority districts across several of the maps. It's not clear the Legislature made any significant changes to district lines, big or small, based on citizen input."

32.    The Legislature completed its redistricting process during an extraordinary legislative session that commenced on February 2, 2022.

33.    The House passed HB 1—establishing a map that largely mirrors the 2011 congressional map and preserves Louisiana's lone majority-Black congressional district, the Second—on February 11, 2022, and sent it to the Senate for further consideration and passage. The Senate took HB 1 under consideration while continuing deliberation of its own proposed map, Senate Bill 5 ("SB 5"), which was nearly identical to HB 1 save for minor discrepancies.

34.    Throughout this process, the Legislature had several opportunities to consider and enact a new congressional map with two majority-Black districts. Senator Cleo Fields—who observed that "[i]t would be unconscionable for [the Legislature] to pass a plan with a single Black district"—introduced *three* maps that included two majority-Black districts. Similar proposals were offered by Senator Karen Carter Peterson, Senator Gary Smith, Senator Gerald Boudreaux, Senator Jay Luneau, and Senator Joseph Bouie, Jr. Many of these proposals included a new majority-Black Fifth Congressional District that united Black voters in north Baton Rouge with the delta parishes along the Mississippi River. Ultimately, none of the maps containing two majority-Black congressional districts made it to the House or Senate floor.

35.    Likewise, both chambers' redistricting committees failed to advance any of the amendments to the House's HB 1 or the Senate's SB 5, which would have created an additional majority-Black congressional district while improving the map's overall adherence to traditional redistricting principles.

36.    Opponents of HB 1 and SB 5 criticized the proposed maps for diluting the voting strength of Black Louisianans. Notably, the drafters of HB 1 and SB 5 did not conduct Section 2 analyses of these maps to ensure compliance with the Voting Rights Act.

37.    HB 1 and SB 5 passed their respective chambers on near-party-line votes on February 18, 2022.

38.    Consistent with his earlier pledge to veto any congressional map that "suffer[s] from defects in terms of basic fairness," Governor Edwards vetoed the proposed maps on March 9, 2022. In his veto message, he explained that he

> vetoed the proposed congressional map drawn by Louisiana's Legislature because it does not include a second majority African American district, despite Black voters making up almost a third of Louisianans per the latest U.S. Census data. This map is simply not fair to the people of Louisiana and does not meet the standards set forth in the federal Voting Rights Act. The Legislature should immediately begin the work of drawing a map that ensures Black voices can be properly heard in the voting booth. It can be done and it should be done.

39.    Rather than heed this advice and draw a new congressional plan that complied with the Voting Rights Act, the Legislature instead overrode the veto of HB 1 on March 30, 2022.

## IV.    Louisiana's New Congressional Plan

40.    In enacting Louisiana's new congressional map, the Legislature diluted the political power of the state's Black voters. Rather than create a second majority-Black congressional district, the Legislature packed Black voters into the Second Congressional District, the state's single majority-Black district, and cracked other Black voters among districts that extend into predominantly white communities in the southern, western, and northern reaches of the state.

41.    Notably, three of the state's five parishes with the highest Black populations—East Carroll Parish (70.7 percent), Madison Parish (63.5 percent), and Tensas Parish (55.8 percent)—are located in the predominantly white Fifth Congressional District.

42.    The Second and Sixth Congressional Districts both sacrifice compactness and other redistricting principles to dilute Black voting strength by respectively packing and cracking Black voters. For example, the Sixth Congressional District oddly carves up East Baton Rouge Parish, which is home to the historically Black college Southern Agricultural and Mechanical University

and has an overall Black population of about 46 percent. Many other parishes are similarly split along the winding, circuitous border between the Second and Sixth Congressional Districts, including several with Black populations above 40 percent like Iberville and St. John the Baptist.

43.     Ultimately, the Black population along the Louisiana/Mississippi border and in the central part of the state is sufficiently numerous and geographically compact to create a second majority-Black congressional district, one that readily complies with traditional redistricting principles.

**V.     Racial Polarization in Louisiana**

44.     As courts in this state have long concluded, voting in Louisiana is severely racially polarized, with Black and white voters cohesively supporting opposing candidates. *See, e.g.*, *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 436–37 (M.D. La. 2017) (recognizing racially polarized voting in Terrebonne Parish), *overruled on other grounds sub nom. Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020); *St. Bernard Citizens for Better Gov't v. St. Bernard Par. Sch. Bd.*, No. CIV.A. 02-2209, 2002 WL 2022589, at *9 (E.D. La. Aug. 26, 2002) (recognizing racially polarized voting in St. Bernard Parish); *Clark v. Edwards*, 725 F. Supp. 285, 298–99 (M.D. La. 1988) (concluding that "across Louisiana and in each of the family court and district court judicial districts as well as in each of the court of appeal districts, there is consistent racial polarization in voting"), *vacated on other grounds*, 750 F. Supp. 200 (M.D. La. 1990); *Citizens for Better Gretna v. City of Gretna*, 636 F. Supp. 1113, 1124–31 (E.D. La. 1986) (recognizing racially polarized voting in City of Gretna), *aff'd*, 834 F.2d 496 (5th Cir. 1987); *Major v. Treen*, 574 F. Supp. 325, 337–39 (E.D. La. 1983) (three-judge court) (recognizing racial polarization in Orleans Parish).

45.     Black voters in Louisiana are politically cohesive and overwhelmingly support the same candidates.

46.    The state's white voters, in turn, are also politically cohesive, voting in opposition to Black-preferred candidates.

47.    The white majority in Louisiana votes as a bloc usually to defeat Black voters' candidates of choice.

48.    For example, *The New York Times* reported that in the 2020 presidential election, the vast majority of Black voters in Louisiana—88 percent—voted for Joe Biden, as compared to only 22 percent of white voters. Consequently, President Biden lost the statewide vote by a margin of nearly 20 percentage points.

49.    This pronounced racially polarized voting exists both statewide and in the individual congressional districts at issue in this case.

## VI.    Voting-Related Racial Discrimination in Louisiana

50.    Louisiana has a long, tragic history of voting-related discrimination—one so deeply ingrained that "it would take a multi-volumed treatise to properly describe the persistent, and often violent, intimidation visited by white citizens upon black efforts to participate in Louisiana's political process." *Citizens for Better Gretna*, 636 F. Supp. at 1116. This pattern of discrimination is not confined to history books. The legacy of prejudice and state-sponsored intimidation manifests itself today in state and local elections marked by racial appeals and undertones, and the consequences of the state's historic discrimination persist as well, as Black Louisianians continue to experience socioeconomic hardship and marginalization.

51.    From the state's inception through Reconstruction, Louisiana's constitution limited the right to vote to white males, wholly excluding Black citizens from the franchise. In 1898— after the Fifteenth Amendment to the U.S. Constitution guaranteed suffrage to Black men, and as Black voter registration began to increase—Louisiana called a constitutional convention with the purpose of, in the words of the chairman of the convention's judiciary committee, "establish[ing]

the supremacy of the white race." To that end, the delegates enacted several constitutional provisions that specifically targeted Black voters.

52.    For example, Louisiana expanded its felon-disenfranchisement policy to include all individuals convicted of "any crime punishable by imprisonment, and not afterwards pardoned with express restoration of the franchise," as well as all individuals "actually confined in any public prison." This was a drastic expansion from the state's earlier policy, which had limited disenfranchisement to select crimes (bribery, forgery, perjury, and high crimes and misdemeanors), and was directly aimed at disenfranchising Black voters.

53.    Louisiana also became one of the first states to implement a "grandfather clause," a constitutional provision mandating that voter registrants whose fathers or grandfathers had not been registered to vote before 1867 comply with additional property and education requirements. As the president of the state constitutional convention explained, the clause was implemented specifically to "let the white man vote" and "stop the negro from voting."

54.    After the convention, the then-Governor stated that "[t]he white supremacy for which we have so long struggled at the cost of so much precious blood and treasure, is now crystallized into the Constitution as a fundamental part and parcel of that organic instrument." The effects of the 1898 constitutional changes were profound: Black voter registration was reduced from approximately 45 percent to a mere *4 percent* by 1900.

55.    Louisiana's grandfather clause remained in place until it was struck down by the U.S. Supreme Court in *Guinn v. United States*, 238 U.S. 347 (1915). But versions of the state's felon-disenfranchisement policy, which disproportionately affects Black voters, have remained a part of Louisiana's laws governing access to the franchise.

56.     Following the 1898 constitutional convention, Louisiana continued to develop alternative ways to ensure that its Black citizens could not participate in the political process. For example, to replace the grandfather clause, the State implemented "a requirement that an applicant 'give a reasonable interpretation' of any section of the federal or state constitution in order to vote." *Bossier Par. Sch. Bd. v. Reno*, 907 F. Supp. 434, 455 (D.D.C. 1995) (three-judge court) (Kessler, J., concurring in part and dissenting in part), *vacated on other grounds*, 520 U.S. 471 (1997). This "understanding clause" was enforced until 1965, when it was invalidated by the U.S. Supreme Court in *Louisiana v. United States*, 380 U.S. 145 (1965).

57.     Throughout the second half of the 19th century and the first half of the 20th century, Black Louisianians were subjected to sustained political terror and violence. White mobs employed lynchings and massacres of Black citizens to intimidate and prevent them from exercising their constitutional rights. This systemic violence occurred with either the tacit or explicit collusion of state actors and was almost never punished by state law enforcement. In 1868 in St. Landry Parish, for example, white Democrats, angered by growing Black support for white Republican candidates, murdered over 100 Black Louisianians over a two-week period. In 1873, in what became known as the "Colfax Massacre," a white mob massacred approximately 150 Black citizens after a close gubernatorial race. No one was ever prosecuted for these murders.

58.     Ultimately, four out of the five local jurisdictions in the United States that had the most lynchings between Reconstruction and the 1950s were Louisiana parishes, responsible for 540 documented lynchings during that time period.

59.     In the early 1900s, Louisiana also levied poll taxes, which largely prevented Black citizens from voting, and purged Black voters from the registration rolls. In 1923, "the state authorized an all-white Democratic primary which functioned to deny blacks access to the

determinative elections, inasmuch as Republican opposition to the Democratic party in the general elections was nonexistent." *Major*, 574 F. Supp. at 340. The all-white primaries remained in place until 1944, when they were also invalidated by the U.S. Supreme Court in *Smith v. Allwright*, 321 U.S. 649 (1944).

60.     Black voters were also discouraged from voting through force and intimidation. In 1950, for example, George and Frank Guillory, two young Black farmers from St. Landry Parish, visited Opelousas to register for the draft. French speakers, the pair mistakenly ended up in the voter registration office. They were beaten and thrown in jail.

61.     During the 1950s, Louisiana continued its discriminatory voting tactics by implementing a citizenship test and prohibiting single-shot voting provisions. The elimination of the latter was particularly detrimental to Black electoral participation, as single-shot voting had given members of minority communities the ability to aggregate their votes behind single candidates in multimember elections. In 1959, the Legislature established a majority-vote requirement to be elected to party committees, and "from 1940 to 1964, the States Rights Party spearheaded a strong movement against black enfranchisement and judicially-directed desegregation." *Major*, 574 F. Supp. at 340.

62.     In 1965, Congress enacted the Voting Rights Act, and Louisiana was immediately declared a covered jurisdiction under Section 4(b) due to its maintenance of a literacy test and its low level of minority voter registration. *See South Carolina v. Katzenbach*, 383 U.S. 301, 312–13 (1966). As a covered jurisdiction, Louisiana was required to "preclear" any changes to its election practices or procedures with either the U.S. Department of Justice or a federal court.

63.     Even after coming under federal oversight, however, Louisiana persisted in its efforts to limit Black voting power, with Section 5 of the Voting Rights Act often serving as the

lone bulwark to prevent Louisiana from further excluding Black voters from the franchise. Indeed, between 1965 and 2013—at which time the U.S. Supreme Court effectively barred enforcement of the Section 5 preclearance requirement in *Shelby County v. Holder*, 570 U.S. 529 (2013)—the Department of Justice blocked or altered nearly 150 voting-related changes in Louisiana under Section 5. In 1968, for example, an effort to minimize and dilute Black voting strength by allowing parish school boards and police juries to switch to at-large election systems was prevented by objections from the Department of Justice. These objections notwithstanding, between 1971 and 1972, at least 14 parishes—St. Helena, Jefferson Davis, Tangipahoa, Franklin, St. Charles, Assumption, Ascension, Bossier, De Soto, East Feliciana, Natchitoches, Caddo, St. James, and St. Mary—attempted to switch to at-large election systems under the nullified laws.

64.     Undeterred, the Legislature passed a law in 1973 that provided for the use of divisions or numbered posts for multimember elected bodies in all districts, parishes, municipalities, and wards in Louisiana. This would have significantly curtailed the ability of minority candidates to win elections to multimember offices in localities with patterns of racial bloc voting. Again, the law was blocked by a Department of Justice objection. In 1975, the Legislature attempted to prevent single-shot voting in school board elections—an effort that was also blocked by a Department of Justice objection.

65.     Since 1981, much of Louisiana's voting-related discrimination has been perpetrated through discriminatory redistricting schemes that have packed Black voters into few districts or cracked them among many districts, limiting their influence overall. This discriminatory redistricting has been carried out at the state and local levels.

66.     Notably, in 1981, the Legislature attempted to limit Black influence in Congress by implementing a redistricting plan that "cracked" the Black majority in Orleans Parish between two

congressional districts. At the time of the redistricting, highly concentrated Black residents comprised 55 percent of the total population in Orleans Parish. Although multiple plans that included a majority-Black district were proposed, then-Governor Dave Treen "publicly expressed his opposition to the concept of a majority black district, stating that districting schemes motivated by racial considerations, however benign, smacked of racism." *Major*, 574 F. Supp. at 331. The 1981 congressional plan was challenged under Section 2, with the plaintiffs asserting that it diluted Black voting strength. *See id.* at 327. A federal court agreed, enjoining implementation of the plan and requiring that a new map be drawn. *See id.* at 356. The resulting map established the Second Congressional District, the state's first—and today, only—majority-Black congressional district.

67.    The Legislature also attempted to limit Black political influence at the state level in 1981 through a new districting plan for the Louisiana House of Representatives. It approved a map that reduced the number of majority-minority House districts throughout the state, including in Orleans and East Baton Rouge Parishes. The Department of Justice objected to the plan, citing unsatisfactory explanations for the configuration of districts in Orleans, East Baton Rouge, East Feliciana, St. Helena, West Feliciana, and Rapides Parishes, and noting that, overall, the proposed plan "impact[ed] adversely upon black voting strength."

68.    A similar practice was observed during the next two redistricting cycles—in 1991 and 2001—when the Legislature again enacted discriminatory House redistricting plans. In 1991, the Department of Justice objected once more, noting that the proposed House plan minimized Black voting strength in at least seven areas. The Department of Justice explained that "the state has not consistently applied its own [redistricting] criteria, but it does appear that the decision to deviate from the criteria in each instance tended to result in the plan's not providing black voters with a district in which they can elect a candidate of their choice."

69.    In 2001, the Legislature again sought to eliminate a Black-opportunity House district in Orleans Parish. The State sought preclearance in federal court; both the Department of Justice and the NAACP Legal Defense Fund opposed Louisiana's preclearance submission. The case settled on the eve of trial, with the State withdrawing the plan and restoring the Black-opportunity district.

70.    In addition to the State's efforts to minimize minority representation through congressional and legislative redistricting, the Legislature has also taken other actions to discriminate against Louisiana's Black citizens. In 1994, Louisiana attempted to impose a photo ID requirement for first-time voters who cast their ballots by mail. The Department of Justice found that this law would adversely impact the state's Black population.

71.    Throughout the 1980s and 1990s, Louisiana continued its attempts to expand and reinforce at-large voting for judges, school boards, and boards of alderman, despite repeated warnings of the detrimental impact at-large systems have on Black voters. Indeed, in 1969, 1989, 1990, 1991, 1992, and 1994, Louisiana attempted to add at-large or multimember judicial seats, blatantly ignoring objections and requests for more information raised by the Department of Justice in response. The State's actions were so egregious that, in 1990, this Court reprimanded Louisiana in *Clark v. Roemer*, stating that it had "absolutely no excuse for its failure, whether negligent or intentional, to obtain preclearance of legislation when such preclearance is required by the Voting Rights Act of 1965." 751 F. Supp. 586, 589 n.10 (M.D. La 1990) (three-judge court), *reversed on other grounds*, 500 U.S. 646 (1991).

72.    In 1998, the Legislature attempted to facilitate local governments' resistance to drawing additional majority-minority districts when it passed a law freezing local voting precinct lines through 2003—which included the three years following the 2000 census. The Department

of Justice objected, preventing the law from being implemented. Nevertheless, in 2009, the Legislature again tried to freeze precinct lines; the Department of Justice again objected.

73.     In 2001, the Legislature adopted a plan that allowed electors in St. Bernard Parish to reduce the size of the school board from eleven single-member districts to five single-member districts and two at-large seats, thus eliminating the sole majority-minority voting district in the parish. A federal court later found that this new plan violated Section 2. *See St. Bernard Citizens*, 2002 WL 2022589, at *10.

74.     In addition to these actions at the state level, localities have also repeatedly discriminated against Black Louisianians through changes to their voting rules. At least 44 of Louisiana's 65 parishes—over 67 percent—received objections from the Department of Justice during the time that Louisiana was a covered jurisdiction, including, among others, Ascension, Assumption, Avoyelles, East Baton Rouge, East Feliciana, East Carroll, Iberia, Iberville, Madison, Orleans, Pointe Coupee, St. Mary, St. Landry, St. Charles, St. James, St. Helena, St. Martin, Tensas, West Feliciana, and West Baton Rouge Parishes. A majority of these objections concerned redistricting.

75.     Louisiana's practice of voter discrimination is not merely historic. The State continues to implement voting practices that have hindered the ability of Black citizens to participate equally in the political process.

76.     The Department of Justice authorized sending observers to more than 11 Louisiana parishes—including Orleans Parish as recently as 2016—to ensure compliance with federal voting laws.

77.     Moreover, as discussed above, Louisiana continues to disenfranchise felons. Although voters approved a 1974 constitutional provision that made suspension of voting rights

*permissive* for people "under order of imprisonment for conviction of a felony," the Legislature later decided to make this suspension *mandatory* and defined the phrase to include all people in prison, on probation, or on parole. Although recent legislative efforts and legal challenges have reduced the scope of Louisiana's felon-disenfranchisement laws, they continue to have a disproportionate impact on the state's Black voters.

## VII.    Ongoing Effects of Louisiana's History of Discrimination

78.    During the late 19th century, in a direct repudiation of political gains made by Black Louisianians during Reconstruction, the State began enacting Black Codes and Jim Crow laws that restricted the liberty of Black citizens in nearly every sphere of life, including transportation, housing, education, business ownership, contracting, criminal justice, and public accommodation. Louisiana's Black citizens bear the effects of the State's official history of discrimination even today. These socioeconomic disadvantages hinder their ability to participate effectively in the political process.

79.    "*De facto* racial segregation remains in education in Louisiana. About 74% of all black elementary and secondary students attend majority-minority schools. Only thirteen states have higher percentages of black students in these majority-minority schools." *Terrebonne Par. Branch NAACP*, 274 F. Supp. 3d at 442–43 (footnote omitted). According to the U.S. Census Bureau's 2019 American Community Survey ("ACS") 1-Year Estimate, Black Louisianians are also more than 10 percent less likely to hold bachelor's degrees than white Louisianians.

80.    In addition to lower levels of educational attainment, Black Louisianans experience lower employment rates and correspondingly higher levels of poverty than white residents. According to the 2019 ACS 1-Year Estimate, the unemployment rate for Black Louisianians was nearly double that of white Louisianians, while the median household income for Black Louisianians was almost half of the median for white Louisianians. Black Louisianians are three

times as likely as white Louisianians to receive food stamps, and based on the 2019 ACS 1-Year Estimate, 24.9 percent of Black households live below the poverty line, compared to just 8.8 percent of white households.

81. The effects of Louisiana's long history of discrimination are also evident in persistent health disparities. According to the Louisiana Department of Health, the death rate for Black Louisianians was approximately one to two times the rate for white Louisianians. The Centers for Disease Control and Prevention reported that the infant mortality rate—a key indicator of overall health status—is the highest for Louisiana's non-Hispanic Black infants and more than double the non-Hispanic white infant mortality rate. The Louisiana Department of Health reported in 2018 that four Black mothers die for every white mother and two Black babies die for every one white baby.

82. As of 2015, not only did Louisiana rank number one in its statewide imprisonment rate, but Black inmates were overrepresented in the state's jails while white Louisianians were underrepresented. Indeed, as of 2014, Black residents of Louisiana were four times as likely to be imprisoned as white residents.

**VIII. Racial Appeals in Louisiana Politics**

83. In addition to Louisiana's history of voting-related discrimination against its Black citizens, the state's political campaigns have been subjected to both overt and subtle racial appeals.

84. In 1989, Louisiana made national headlines when David Duke—former Grand Wizard of the Knights of the Ku Klux Klan—was elected to the Louisiana House of Representatives. Duke, who claimed to be the spokesman for the "white majority," went on to run for the U.S. Senate in 1990, Louisiana governor in 1991, and the U.S. Senate again in 2016.

85. During his 1991 campaign for governor, Duke stated that one of his opponents, then-Governor Buddy Roemer, was "an NAACP member who supports reverse discrimination."

Duke placed second in the initial round of voting with 31.7 percent of the vote. During the subsequent runoff election, Duke equated affirmative action with "racist" and "intolerant organizations," and his campaign was characterized by rhetoric promising to save Louisiana by giving Black residents "tough love." Duke stated, "If you are white these days you are a second-class citizen in your own country." While Duke lost the runoff election, he garnered more than 670,000 votes—nearly 40 percent—and ultimately claimed a moral victory, saying, "I won my constituency. I won 55% of the white vote." When asked why he voted for Duke, one of Duke's supporters explained, "I feel like the blacks get too much their own way. You don't see white people spitting out babies like they do."

86.     In 2016, Duke made a second run for the U.S. Senate. In explaining why he joined the race, Duke's campaign manager stated, "He became very concerned in regards to the Obama administration and the unhealthy way the mainstream media was affecting the racial climate in this country, with this bias toward African Americans against the police officers."

87.     Even moderate Republican candidates in Louisiana have made subtle racial appeals. In particular, the white candidate and eventual winner of the 1995 gubernatorial race ran against Black Congressman Cleo Fields—the first Black candidate for governor in Louisiana in over 100 years—and supported a platform of repealing affirmative action, challenging a second majority-Black congressional district in Louisiana, and opposing the National Voter Registration Act, which was widely viewed as a tool to increase Black voter registration. Moreover, the winning candidate did not repudiate an endorsement he received from a white nationalist group associated with Duke, and at one point stated that Jefferson Parish was "right next to the jungle in New Orleans and has a very low crime rate." The white candidate won the runoff election with 64 percent of the vote, compared to 36 percent for Congressman Fields. Reports indicated that only 4

percent of Black voters cast ballots for the eventual winner, while 98 percent of Congressman Fields's support came from Black voters.

88.    As another example of race-based appeals in Louisiana campaigns, in 2014, it was revealed that Congressman Steve Scalise spoke to a white supremacist gathering while serving as a Louisiana state representative in 2002.

## IX.    Black Officeholders in Louisiana

89.    Against this backdrop of discrimination and racial appeals, Black Louisianians struggle to be elected to public office. None of the current statewide elected officials is Black. Louisiana has not had a Black governor since Reconstruction—even though Black candidates advanced to runoff elections in 1995 and 1999—and Louisiana has never had a Black U.S. senator.

90.    Although Black candidates have experienced some success in local races, this has predominantly occurred in majority-Black areas. For example, only one Black justice sits on the Louisiana Supreme Court; she was elected in a majority-Black district originally created as a result of a consent decree resulting from a Section 2 challenge to Louisiana's at-large judicial electoral scheme. Likewise, fewer than one-quarter of the members of the Louisiana State Senate and Louisiana House of Representatives are Black; all were elected from majority-minority districts.

91.    "Statewide, blacks have also been underrepresented in the trial and appellate courts. While the black population comprises about 30.5% of the voting age population in Louisiana, black people only account for about 17.5% of the judges in Louisiana." *Terrebonne Par. Branch NAACP*, 274 F. Supp. 3d at 445.

92.    The only Black member of Louisiana's delegation to the U.S. House of Representatives is from the Second Congressional District, the state's sole majority-Black congressional district.

**CLAIM FOR RELIEF**

**COUNT I**
**Violation of Section 2 of the Voting Rights Act**
**52 U.S.C. § 10301**

93.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

94.    Section 2 of the Voting Rights Act prohibits the enforcement of any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or" membership in a language minority group. 52 U.S.C. § 10301(a).

95.    Louisiana's congressional district boundaries, as newly drawn, crack and pack the state's Black population with the effect of diluting its voting strength, in violation of Section 2.

96.    Black Louisianians are sufficiently numerous and geographically compact to constitute a majority of eligible voters in a second congressional district stretching from Baton Rouge to the delta parishes along the Mississippi River.

97.    Under Section 2 of the Voting Rights Act, the Legislature was required to create this additional congressional district in which Black voters would have the opportunity to elect their candidates of choice.

98.    Black voters in Louisiana, including in and around this area, are politically cohesive. Elections in this area reveal a clear pattern of racially polarized voting that allows blocs of white voters usually to defeat Black voters' preferred candidates.

99.    The totality of the circumstances establishes that the new congressional plan has the effect of denying Black voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act.

100.    In enforcing the district boundaries of the new congressional map, Defendant has and, absent relief from this Court, will continue to deny Plaintiffs' rights guaranteed to them by Section 2 of the Voting Rights Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that HB 1 violates Section 2 of the Voting Rights Act;

B.    Enjoin Defendant, as well as his agents and successors in office, from enforcing or giving any effect to the boundaries of the congressional districts as drawn in HB 1, including an injunction barring Defendant from conducting any further congressional elections under the new map;

C.    Hold hearings, consider briefing and evidence, and otherwise take actions necessary to order the adoption of a valid congressional plan that includes a second congressional district in which Black voters have the opportunity to elect their preferred candidates, as required by Section 2 of the Voting Rights Act; and

D.    Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated: March 30, 2022

Respectfully submitted,

By /s/ Darrel J. Papillion
Darrel J. Papillion (Bar Roll No. 23243)
Renee C. Crasto (Bar Roll No. 31657)
Jennifer Wise Moroux (Bar Roll No. 31368)
**WALTERS, PAPILLION,
THOMAS, CULLENS, LLC**
12345 Perkins Road, Building One
Baton Rouge, Louisiana 70810
Phone: (225) 236-3636
Fax: (225) 236-3650
Email: papillion@lawbr.net
Email: crasto@lawbr.net
Email: jmoroux@lawbr.net

Abha Khanna*
Jonathan P. Hawley*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: akhanna@elias.law
Email: jhawley@elias.law

Lalitha D. Madduri*
Olivia N. Sedwick*
Jacob D. Shelly*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: lmadduri@elias.law
Email: osedwick@elias.law
Email: jshelly@elias.law

*Counsel for Plaintiffs*

*Pro hac vice* application forthcoming